PETER BIBRING (SBN 223981)
pbibring@aclusocal.org
CARMEN IGUINA (SBN 277369)
ciguina@aclusocal.org
CATHERINE WAGNER (SBN 302244)
cwagner@aclusocal.org
MELANIE P. OCHOA (SBN 284342)
mpochoa@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile:  (213) 977-5299

*Counsel for Plaintiffs*
(Additional Counsel for Plaintiffs on Following Page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOUTH JUSTICE COALITION, a non-profit organization; PETER ARELLANO and JOSE REZA, individuals, for themselves and on behalf of a class of similarly-situated individuals, <br><br>        *Plaintiffs,* <br><br>     vs. <br><br> CITY OF LOS ANGELES; MIKE FEUER, City Attorney of the City of Los Angeles, in his official capacity; CHARLIE BECK, Chief of the Los Angeles Police Department, in his official capacity; DOES 1 through 10, in their official and individual capacities, <br><br>        *Defendants.* | Case No. 2:16-cv-07932-SJO-RAO <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION FOR PLAINTIFF PETER ARELLANO** <br><br> **CLASS ACTION** <br><br> Date:   December 5, 2016 <br> Time:   10:00 AM <br> Place:  Courtroom 1 |

JACOB S. KREILKAMP (SBN 248210)
jacob.kreilkamp@mto.com
LAURA D. SMOLOWE (SBN 263012)
laura.smolowe@mto.com
AMELIA L.B. SARGENT (SBN 280243)
amelia.sargent@mto.com
MARIA JHAI (SBN 283059)
maria.jhai@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue,
Thirty-Fifth Floor
Los Angeles, California  90071-1560
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

ANKUR MANDHANIA (SBN 302373)
ankur.mandhania@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California  94105-2907
Telephone:   (415) 512-4000
Facsimile:    (415) 512-4077

JOSHUA GREEN (SBN 293749)
jgreen@urbanpeaceinstitute.org
THE CONNIE RICE INSTITUTE FOR URBAN PEACE
1910 West Sunset Boulevard
Suite 800
Los Angeles, California  90026
Telephone:   (213) 404-0124
Facsimile:    (213) 402-2843

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF FACTS .............................................................................. 1

    A.   Defendants' Echo Park Gang Injunction ............................................. 1

    B.   Terms of Echo Park Injunction ............................................................ 2

    C.   Defendants' Process for Serving and Enforcing Gang
       Injunctions .............................................................................................. 3

    D.   Mr. Arellano, and Service and Enforcement of Echo Park
       Injunction ............................................................................................... 6

III. ARGUMENT ................................................................................................. 8

    A.   Mr. Arellano is Likely to Succeed on the Merits ................................ 9

         i.   Defendants' Enforcement of the Gang Injunction
            Deprives Mr. Arellano of a Protected Liberty Interest ............... 9

         ii.  Mr. Arellano Has Been Denied Procedural Protections ........... 12

             1.   The Private Interest in Constitutional Freedoms is
                Weighty ............................................................................. 13

             2.   The Risk of Erroneous Deprivation is
                "Considerable" and Post-Deprivation Remedies
                are Inadequate .................................................................. 13

             3.   Defendants Have No Interest in Failing to Provide
                Process .............................................................................. 17

             4.   The California Constitution ............................................... 19

    B.   Mr. Arellano Suffers Ongoing Irreparable Harm .............................. 19

    C.   The Equities Tip Sharply in Mr. Arellano's Favor ............................ 19

    D.   A Preliminary Injunction is in the Public Interest ............................. 20

IV.  CONCLUSION ............................................................................................ 20

MEMORANDUM ISO MOTION FOR PI FOR PETER ARELLANO

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011).................................................................... 9

*Am. Trucking Ass'ns v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009).................................................................... 9

*Bolling v. Sharpe*,
  347 U.S. 497 (1954) .................................................................................... 9

*Brittain v. Hansen*,
  451 F.3d 982 (9th Cir. 2006)................................................................... 9-10

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) (plurality opinion)...................................................... 10

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................. 19

*First Nat'l Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978) .................................................................................. 10

*Golden Gate Rest. Ass'n v. City and County of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008).................................................................. 20

*Humphries v. County of Los Angeles*,
  554 F.3d 1170 (9th Cir. 2009), rev'd on other grounds, 562 U.S. 29
  (2010)................................................................................................... 13, 18

*Joint Anti-Fascist Refugee Committee v. McGrath*,
  341 U.S. 123 (1951) .................................................................................. 20

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983)................................................................... 20

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................... 12, 13, 17, 19

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012).................................................................... 19

-ii-

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Miller v. California,*
  355 F.3d 1172 (9th Cir. 2004)................................................................ 12

*Nunez ex rel. Nunez v. City of San Diego,*
  114 F.3d 935 (9th Cir. 1997).................................................................. 11

*Preminger v. Principi,*
  422 F.3d 815 (9th Cir. 2005).................................................................. 20

*Raich v. Gonzales,*
  500 F.3d 850 (9th Cir. 2007).................................................................. 10

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)....................................................................... 10, 11

*Rosenbaum v. Washoe Cty.,*
  663 F.3d 1071 (9th Cir. 2011)................................................................ 11

*S.O.C., Inc. v. Cnty. of Clark,*
  152 F.3d 1136 (9th Cir. 1998)................................................................ 19

*Shinault v. Hawks,*
  782 F.3d 1053 (9th Cir. 2015)................................................................ 16

*United States v. Juvenile Male,*
  670 F.3d 999 (9th Cir. 2012)............................................................... 9, 12

*United States v. Wolf Child,*
  699 F.3d 1082 (9th Cir. 2012)................................................................ 11

*Vasquez v. Rackauckas,*
  734 F.3d 1025 (9th Cir. 2013)......................................................... 1, passim

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ......................................................................... 8-9

*Zinermon v. Burch,*
  494 U.S. 113 (1990) ...................................................................... 15

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**STATE CASES**

*People v. Englebrecht*,
88 Cal. App. 4th 1236 (2001) ................................................................. 4

*Today's Fresh Start, Inc. v. L.A. Cnty. Office of Educ.*,
57 Cal. 4th 197 (2013) ........................................................................ 19

**CASES - OTHER**

*People v. Big Top Locos, et al.*,
L.A. Super. Ct. No. BC511444 ....................................................... 1, 2

**STATE STATUTES**

Cal. Penal Code § 166(a)(9) ....................................................................... 4

Cal. Penal Code §§ 186.20–186.33 ........................................................... 1

Cal. Penal Code § 186.35 (added 2016 by A.B. 2298) ............................. 4

**OTHER AUTHORITIES**

Office of Los Angeles City Attorney, *List of Gang Injunctions*,
http://www.lacityattorney.org/gang-injunction (last visited Oct. 26,
2016). ........................................................................................................ 1

## I.      INTRODUCTION

Plaintiff Peter Arellano seeks the intervention of this Court to stop police and prosecutors from enforcing against him a restrictive civil "gang injunction" that Defendants imposed on him with no prior notice, no process or opportunity to contest their allegation that he is a gang member, and in disregard of basic fairness.

The Ninth Circuit has already held that in enforcing a gang injunction against individuals without first providing them an opportunity to contest their designation as gang members, police and prosecutors "violate[] Plaintiffs' rights under the Due Process Clause." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1053 (9th Cir. 2013). Plaintiffs as a class—and Plaintiff Arellano in this motion—present precisely the same claim as in *Vasquez*, based on the City of Los Angeles' nearly identical practices enforcing very similar gang injunctions.

Because the due process claim presented by Mr. Arellano unquestionably is likely to succeed under the clear holding of *Vasquez*; because the enforcement of a restrictive gang injunction against him without due process imposes ongoing, irreparable harm; and because Defendants' interests in refusing to provide process are minimal, Mr. Arellano meets the criteria for preliminary injunctive relief.

## II.     STATEMENT OF FACTS

### A.      Defendants' Echo Park Gang Injunction

Gang injunctions are orders obtained in civil public nuisance actions in state court against alleged gang entities, which enjoin the activities of the gang in a particular area (the "Safety Zone"). *See* Cal. Penal Code §§ 186.20–186.33. Currently, the City of Los Angeles has at least forty-six gang injunctions against seventy-nine alleged gangs. *See* Office of Los Angeles City Attorney, *List of Gang Injunctions*, http://www.lacityattorney.org/gang-injunction (last visited Oct. 26, 2016).

The City of Los Angeles obtained the Echo Park injunction in the same one-sided fashion as the gang injunction at issue in *Vasquez*. *See Vasquez*, 734 F.3d at

1032. Specifically, the City Attorney filed a public nuisance action, but instead of naming as defendants the individuals who police and prosecutors asserted were active participants of the gang, the City instead sued six alleged gang entities, including the "Echo Park Locos," as "unincorporated associations." *See* Plaintiffs' Request for Judicial Notice ("RJN"), Ex. 84, Case Summary for Case Number: BC511444, *People v. Big Top Locos, et al.* at 1.[1] Because the gangs were not represented, there was no substantive challenge to the nuisance action and the City—like the Defendants in *Vasquez*—obtained the permanent gang injunction by default judgment. *See id.*, Ex. 2 Permanent Injunction issued September 24, 2013 in *People v. Big Top Locos, et al.*, L.A. Super. Ct. No. BC511444 ("Echo Park Injunction").

Even though he was not named as a defendant in the case, Mr. Arellano—as well as some other community members—sought to intervene in the state court action because he feared that the City would impose the injunction against him once it had been issued by the state court. *See id.*, Ex. 95, *People v. Big Top Locos*, L.A. Super. Ct. No. BC511444, Declaration of Peter Arellano in Support of Motion for Leave to File Complaint in Intervention (Oct. 2, 2013). The City opposed, and his request to intervene was denied as untimely. *See* Declaration of Peter Arellano ("Arellano Decl.") ¶ 14; *see also* RJN, Ex. 94, *People v. Big Top Locos, et al.,* L.A. Super. Ct. No. BC511444, Ruling re: Motions to Intervene of Proposed Intervening Defendants (Nov. 13, 2013).

### B.   Terms of Echo Park Injunction

The terms of the Echo Park injunction are very similar—and in some respects, nearly identical—to the injunction at issue in *Vasquez*. Like the Orange

---

[1] In *Vasquez*, the District Attorney initially named individuals as defendants in the civil nuisance action, but later dismissed them from the case to pursue the case just against the gang entity, such that the individuals had no opportunity to contest the allegations that they were gang members. As a result, the District Attorney—like the City Attorney here—obtained the injunction by virtue of a default judgment.

Varrio Cypress gang injunction in *Vasquez*, it prohibits enjoined individuals from associating in public with other so-called "known" gang members ("Do Not Associate" Provision). This provision prohibits:

> Standing, sitting, walking, driving, gathering, or appearing, anywhere in public view, in a public place, or any place accessible to the public, with any other known member of a Defendant Gang. . . .

Echo Park Injunction at 3-4. A public place is "any place to which the public has access, including but not limited to sidewalks, alleys, streets, highways, parks, hospitals, office buildings, transport facilities, businesses, and the common areas of schools." *Id.* at 4. This prohibition also applies to "all methods of travel." *Id.* The injunction allows individuals to seek an exception from this provision, but only in writing and for a specific "legitimate purpose." *Id.* at 5. Other restrictions prohibit enjoined individuals from being on a property belonging to another person without prior written consent or the presence of the owner, agent, or person in lawful possession of the property. *Id.* at 4. The injunction also prohibits otherwise lawful activities, such as "possessing any aerosol paint container, felt tip marker, paint marker, [or] spray paint tip," and drinking alcohol "in public view, in a public place, or any place accessible to the public, except when on licensed premises where alcohol consumption is authorized." *Id.* at 4-5.

The Echo Park injunction is effective for five years against a served individual, and then can be re-served on that person. *See id.* at 7. It contains an "Opt-Out Provision" allowing an enjoined individual to petition the Court for an order that he is not subject to the injunction, but a pending petition does not stay enforcement of the injunction. *Id.* at 5-6.

## C.    Defendants' Process for Serving and Enforcing Gang Injunctions

Defendants' own policies show that their process for serving an individual with a gang injunction is substantively identical to that of police and prosecutors in *Vasquez*. Armed with the injunction issued by default against the gang, Defendants then personally "serve" the injunction on real people who police and prosecutors

assert are "active participants" in the gang. *See* Declaration of Catherine Wagner ("Wagner Decl."), Ex. A, Office of the City Attorney, City of Los Angeles, *Gang Injunction Program Guidelines* (Nov. 2009) ("2009 Guidelines") at 7-8; *id.*, Ex. E, Deposition of Allan Nadir (Sept. 16, 2014) ("Nadir Depo.") 46:8-12, 48:12-16; *see also People v. Englebrecht*, 88 Cal. App. 4th 1236, 1261 (2001) (holding gang injunctions may be enforced against "active participants" whose participation in gang activities is "more than nominal, passive, inactive or purely technical"). Personal delivery of an existing injunction does not make the individual party to any legal action or begin a court process—rather, service means that Defendants consider the individual bound by the order and subject to arrest and prosecution for violating its terms. Once served, the individual must choose between abiding by the restrictions of the injunction and refraining from prohibited behaviors—including otherwise legal conduct such as association with family and friends in public spaces—or risking arrest and prosecution for contempt of court, a misdemeanor punishable by up to six months in jail and a fine of up to $1,000 under Penal Code § 166(a)(9). *See* 2009 Guidelines, App. A at 24-26.

Defendants' decision to serve someone with a gang injunction is entirely one-sided. The individual subject to the injunction plays no part.[2] *See* Nadir Depo. 50:10-51:3; Wagner Decl., Ex. F, Deposition of Angel Gomez, Vol. 1A (Sept. 19, 2016) ("Gomez Depo.") 28:9-29:6. Defendants do not notify individuals of their intent to serve them with an injunction or inform them of the reasons Defendants

---

[2] Notably, LAPD employs a similarly one-sided determination in deciding to include individuals in the CalGang Criminal Intelligence System. A state audit that included LAPD found "numerous instances" in which agencies could "not substantiate CalGang entries they had made." RJN Ex. 93, *The CalGang Criminal Intelligence System — As the Result of Its Weak Oversight Structure, It Contains Questionable Information That May Violate Individuals' Privacy Rights*, Report 2015-130, AUDITOR.CA.GOV (Aug. 11, 2016), https://www.auditor.ca.gov/pdfs/reports/2015-130.pdf. Partly in response to these findings, California passed legislation requiring law enforcement—including LAPD—to provide notice and an opportunity for appeal to a superior court to individuals they seek to place in the CalGang database. *See* Cal. Penal Code § 186.35 (added 2016 by A.B. 2298).

think they are gang members. *See* 2009 Guidelines at 7-8. Those individuals have no opportunity for a hearing, no chance to attack (or even learn) the evidence against them, no chance to submit evidence of their own to show that they are not gang members, and no chance to appeal to a neutral factfinder, before Defendants serve them with the injunction and force them to abide by its terms.

Under guidelines issued by the City Attorney in November 2009, the Los Angeles Police Department ("LAPD") must obtain prior approval from a Deputy City Attorney before serving an individual with a gang injunction. *See id.* at 8; Wagner Decl., Ex. D, Deposition of Anne C. Tremblay (Sept. 4, 2012) ("Tremblay Depo.") 98:20-24; *id.*, Ex. B, Office of Operations, Operations Order No. 2 (Dec. 9, 2009) ("Order No. 2") at 2; *see also* Gomez Depo. 28:9-29:6. The guidelines provide that Defendants can serve an individual if there is documentation establishing that the person is a gang member and that his or her participation in the gang during the previous five years has been more than nominal, passive, inactive, or purely technical. *See* 2009 Guidelines at 8; Order No. 2 at 2. They further purport to require that gang membership be established beyond a reasonable doubt, and set forth criteria to consider when assessing gang membership, any two of which they deem strong evidence of gang membership, though "not necessarily dispositive." These criteria include that the individual admitted gang membership; was "identified as a gang member" (by a "reliable informant or source" or an "untested informant or source with corroboration"); was witnessed "wearing distinctive gang attire;" was seen "displaying gang hand signs or symbols;" "has gang tattoos;" "frequents gang hangouts;" "openly associates with documented gang members;" or "has been arrested, alone or with known gang members, for a crime usually indicative of gang activity." 2009 Guidelines, App. A at 22-23; *see also* Echo Park Injunction at 3 n.1 (closely tracking 2009 Guidelines criteria for assessing gang membership). But the guidelines conclude: "The Gang Deputy should exercise independent and informed judgment based on all available

evidence and the totality of the circumstances." 2009 Guidelines, App. A at 23.

The Echo Park injunction, like seventeen of Defendants' forty-six injunctions, contains an "opt-out" provision by which a served individual may move the court for an order not to enforce the injunction against him. Some of these provisions require that, for the City not to oppose the motion, the individual meet certain criteria, including some that have little to do with gang membership, such as employment or non-gang arrests. *See* RJN, Exs. 1-46. Based on available court records, fewer than five people have petitioned a state court for removal, and none has been successful in that process. *See id.*, Exs. 47-92.

Beginning in about April 2007, the City Attorney also established a post-deprivation administrative process by which individuals can apply to be removed from gang injunctions. *See* Tremblay Depo. 245:16-246:4; *see also* Wagner Decl., Ex. G, Office of the City Attorney, City of Los Angeles, *Gang Injunction Guidelines* (Apr. 2007), App. B at 42-43. But this process is painstakingly slow; even applicants who satisfy all the stated requirements often wait more than a year for a determination. *See generally* Declaration of Joshua Green ("Green Decl."); *see also* Declaration of Ana Muñiz ("Muñiz Decl.") ¶ 35. Defendants have removed fewer than fifty applicants through the administrative process during the nearly ten years it has been in place. *See* Muñiz Decl. ¶ 35.

### D. Mr. Arellano, and Service and Enforcement of Echo Park Injunction

Mr. Arellano was born, raised, and has lived all twenty-one years of his life in the Echo Park neighborhood. *See* Arellano Decl. ¶ 1. He lives with his parents in the house they have owned since he was about six years old. *Id.* ¶ 2. He attended the elementary school across the street from his house. *Id.* ¶ 5. Mr. Arellano has extended family who also live in Echo Park, as well as childhood friends who still live in or visit the neighborhood. *Id.* ¶ 4. His home, as well as the surrounding neighborhood, fall within the Safety Zone of the Echo Park injunction.

Beginning when Mr. Arellano was around ten or eleven years old, LAPD would regularly stop, and sometimes arrest, Mr. Arellano whenever they found him around Echo Park. *Id.* ¶ 8. While he was a teenager, police stopped him weekly and accused him of being part of the Echo Park gang. *Id.* ¶ 9. Officers regularly asked Mr. Arellano for his "moniker" or gang name, and he would reply that he did not have one. *Id.* In many of these encounters, LAPD officers would fill out field interview ("F.I.") cards,[3] and Mr. Arellano believes that officers wrongly identified him as a member of the Echo Park gang. *Id.*

Mr. Arellano has a single criminal conviction for a misdemeanor, which has since been dismissed. Specifically, in about April 2014, LAPD officers arrested Mr. Arellano and charged him with vandalism with a gang enhancement allegation. *Id.* ¶ 11. Mr. Arellano moved to dismiss the charge and gang enhancement, and ultimately pled no contest to a misdemeanor, without any gang enhancement. *See* Arellano Decl. ¶ 11. He was sentenced to summary probation and community service, completed the community service and was discharged from probation early, and has since had his record dismissed per Cal. Penal Code § 1203.4. *Id.*

In or about June 2015, when Mr. Arellano was outside near his home with his father, friends, and neighbors, the police approached and detained the group, handcuffing Mr. Arellano and others. *See id.* ¶ 16. The officers explained that they had received a vandalism complaint about eight to ten blocks away, then requested identifying information from the detained individuals and issued field interview ("F.I.") cards. *Id.* As was usual in his encounters with LAPD, the police officers asked Mr. Arellano for his "moniker," and he denied having one. *Id.* After about forty minutes, the officers released him without charge, served him with the Echo Park injunction papers, and informed his father that Mr. Arellano was now subject to its terms. *Id.* Defendants did not provide Mr. Arellano prior notice that they

---

[3] F.I. cards document informal police contact during the course of patrol.

would serve him with the Echo Park injunction that day, nor give him any opportunity to contest the allegation that he was a member of the Echo Park gang before subjecting him to the injunction. *Id.*

Since he was served with the injunction, Mr. Arellano has been arrested and threatened with arrest for violations of its terms. *Id.* ¶ 17. In January, and again in March 2016, Mr. Arellano was arrested for doing nothing more than being outside in "public view" with friends from the neighborhood. *Id.* In May 2016, an officer approached Mr. Arellano as he sat in his front yard with his friends, and commented on how "interesting" it was that Mr. Arellano had a car that was "Echo Park blue." *Id.* ¶ 19. He believes this was a threat of arrest. *Id.*

Because of the injunction, Mr. Arellano has had to severely restrict his activity, particularly with family and friends. Because law enforcement alleges that his father is also a member of the Echo Park gang, Mr. Arellano fears being out in public with him, as this would subject both of them to arrest and prosecution. *Id.* ¶ 21. He is similarly afraid to be seen with his brother, uncle, cousins, and most of his childhood friends, as he believes that LAPD officers also contend that they are members of the Echo Park gang. *Id.* ¶¶ 21-22. Fearing arrest, Mr. Arellano has missed neighborhood social activities and holiday parties, and he generally avoids being out in public whenever he is home in Echo Park. *Id.* ¶ 23. Since graduating high school in 2013, he has been continuously employed but chooses to work far away from Echo Park to avoid police harassment and the threat of enforcement of the gang injunction. *Id.* ¶¶ 7, 20. Mr. Arellano describes his experience living under the Echo Park injunction as being under "house arrest." *Id.* ¶ 26.

## III.   ARGUMENT

To obtain a preliminary injunction, Mr. Arellano must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Even if Mr. Arellano raises only "serious questions going to the merits," the Court can grant relief if the balance of hardships tips "sharply" in his favor, and the remaining equitable factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### A.    Mr. Arellano is Likely to Succeed on the Merits

Mr. Arellano is likely to succeed on the merits of his due process claims. As the Ninth Circuit already ruled in *Vasquez* on very similar facts, the government violates due process when it subjects an individual to a gang injunction without first providing process to contest the allegation of gang membership.

When analyzing a procedural due process claim, a federal court first "asks whether there exists a liberty or property interest which has been interfered with by the State." *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir. 2012). The court then "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.*[4]

### i.    Defendants' Enforcement of the Gang Injunction Deprives Mr. Arellano of a Protected Liberty Interest

The detailed analysis of the burdens imposed by the terms and restrictions of the gang injunction in *Vasquez* controls here, as the Echo Park injunction has very similar, and in places identical, terms and restrictions as those at issue in that case. As in *Vasquez*, therefore, the Echo Park injunction deprives Mr. Arellano of basic constitutionally protected freedoms, as it has not only restricted his basic freedoms by prohibiting otherwise lawful activity, but has burdened his constitutionally protected freedoms of association and movement.

The "liberty" protected by the Due Process Clause "extends to the full range of conduct which the individual is free to pursue." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). It is not "limited to interests which are fundamental." *Brittain v.*

---

[4] Plaintiffs' challenge to Defendants' procedures does not constitute an attack of the underlying state court judgments. *See Vasquez*, 734 F.3d at 1035-41.

1  *Hansen*, 451 F.3d 982, 1000 (9th Cir. 2006) (internal quotation marks omitted); *see*

2  *also Raich v. Gonzales*, 500 F.3d 850, 862 (9th Cir. 2007) (the "liberty guaranteed

3  by the Due Process Clause… includes a freedom from all substantial arbitrary

4  impositions and purposeless restraints…."). Further, as *Vasquez* recognized, the

5  "'freedoms encompassed by the First Amendment always have been viewed as

6  fundamental components of the liberty safeguarded by the Due Process Clause.'"

7  *Vasquez*, 734 F.3d at 1042 (quoting *First Nat'l Bank of Boston v. Bellotti,* 435 U.S.

8  765, 780 (1978)). This includes the "right to associate with others in pursuit of a

9  wide variety of political, social, economic, educational, religious, and cultural

10  ends." *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984). Even "the freedom to

11  loiter for innocent purposes is part of the 'liberty' protected by the Due Process

12  Clause." *City of Chicago v. Morales,* 527 U.S. 41, 53 (1999) (plurality opinion).

13       The Echo Park injunction, like the injunction in *Vasquez*, burdens these

14  important rights. Because the "Do Not Associate" Provision—which is very

15  similar to the associational restriction in *Vasquez*—prohibits enjoined individuals

16  from associating with others who the police contend are members of the gang

17  "anywhere in public view, in a public place, or any place accessible to the public,"

18  Echo Park Injunction at 3-4, it bars such innocent activity as sitting at a park,

19  walking down the street, or eating at a restaurant, if the police assert that another

20  individual present is a member of the gang. Like the provisions at issue in *Vasquez*,

21  this provision "ha[s] no exception for individuals to engage in First-Amendment

22  protected 'expressive' activity, such as… participating in political demonstrations,

23  or otherwise associating with others in pursuit of the wide variety of political,

24  social, economic, educational, religious, and cultural ends protected by the First

25  Amendment." *Vasquez*, 734 F.3d at 1043 (quoting *Roberts*, 468 U.S. at 622)

26  (internal quotation marks and brackets omitted). Thus, as in *Vasquez*, the

27  associational provisions "implicate constitutionally protected liberty interests." *Id.*

28       Moreover, because the associational restrictions in the Echo Park injunction

contain no exception for association with family members, like the injunction in *Vasquez*, these provisions "burden the constitutionally protected freedom of 'intimate association'… by barring association with family members in public places such as… parks, libraries, stores, and restaurants (and in some instances, at home), if in 'public view'…." *Id.* at 1043 (quoting *Roberts*, 468 U.S. at 618) (internal citations omitted). Courts have held, without equivocation, that the "fundamental right to familial association is a *particularly* significant liberty interest." *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) (emphasis added); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). "The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Roberts*, 468 U.S. at 618. "Interference with that right… requires a powerful countervailing interest and strict adherence to procedures is required." *Wolf Child*, 699 F.3d at 1092 (internal quotation marks and citation omitted). Yet, without *any process*, the City prohibits Mr. Arellano from being out in public, or even in public *view*, with other members of his family who the police assert are members of the gang. Mr. Arellano, who lives in the Safety Zone, cannot sit on his front porch with his own father, or with his uncles and cousins, without violating the terms of the Echo Park injunction.

The Echo Park injunction also burdens the "fundamental right of free movement." *Nunez ex rel. Nunez v. City of San Diego,* 114 F.3d 935, 944 (9th Cir. 1997). It provides that the "prohibition against associating shall apply to all methods of travel." Echo Park Injunction, at 4. That means that Mr. Arellano cannot be in his own car with his father, uncle, or cousins while in the Safety Zone. Further, even if these restrictions—or other restrictions on possessing felt tip markers or being on private property without prior written permission—did not burden constitutional rights, they still implicate liberty interests. Due process

-11-

protections apply because, once subject to the injunction, Mr. Arellano "legally could not do something that [he] could otherwise do." *Miller v. California*, 355 F.3d 1172, 1179 (9th Cir. 2004). Also, as in *Vasquez*, the injunction covers a large neighborhood with commercial areas, parks, churches, a library, and government offices. *See generally* Declaration of Sean Garcia-Leys; *Vasquez*, 734 F.3d at 1045; *see also* Echo Park Injunction at 2 (describing Safety Zone boundaries).

Moreover, as the *Vasquez* court recognized, the act of subjecting Mr. Arellano to the Echo Park injunction in itself "also constitute[s] further 'interference' with liberty interests triggering scrutiny under the Due Process Clause." *Vasquez*, 734 F.3d at 1043 (*quoting Juvenile Male*, 670 F.3d at 1013) (internal brackets omitted). LAPD can arrest—and in fact already has arrested—Mr. Arellano for purported violations of the gang injunction, and the City Attorney can prosecute him for any alleged violations. As in *Vasquez*, this "policy gave Plaintiffs a choice between refraining from a wide variety of otherwise lawful, constitutionally protected activities, or going to jail, quite possibly for some time." 734 F.3d at 1043. Mr. Arellano has presented evidence of the burden imposed by that choice: he has structured his work and social life around avoiding the risk of arrest and prosecution for violating the injunction. *See* Arellano Decl. ¶¶ 20-27.

In sum, the Echo Park injunction implicates important liberty interests, and the Court should scrutinize the procedures the City must afford before depriving Mr. Arellano of these liberty interests. *See Vasquez*, 734 F.3d at 1044.

ii.  <u>Mr. Arellano Has Been Denied Procedural Protections</u>

Under the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the procedures afforded Mr. Arellano prior to the deprivation of his liberty interests were not "constitutionally sufficient." *Juvenile Male*, 670 F.3d at 1013. Under the *Mathews* test, the court examines,

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

-12-

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

### 1. The Private Interest in Constitutional Freedoms is Weighty

In light of the liberty interests identified above, Mr. Arellano's private interest in his constitutional freedoms is weighty indeed. *Vasquez*, 734 F.3d at 1045 ("It follows from our analysis of Plaintiffs' liberty interests… that Plaintiffs' private interests are very strong.") (internal quotation marks and brackets omitted). "The scope of conduct covered… is wide, intruding considerably on the daily lives of those subject to it." *Id.* at 1045; *see also Humphries v. County of Los Angeles*, 554 F.3d 1170, 1193 (9th Cir. 2009), *rev'd on other grounds*, 562 U.S. 29 (2010).

### 2. The Risk of Erroneous Deprivation is "Considerable" and Post-Deprivation Remedies are Inadequate

*Vasquez* compels the conclusion that the risk of error in failing to provide individuals like Mr. Arellano with any pre-deprivation process before subjecting them to an injunction likewise is very high here. In *Vasquez*, the Ninth Circuit considered expert testimony from two of the same experts submitted here—Professors Malcolm Klein and Diego Vigil, two pre-eminent scholars in the study of gangs—on "the informal structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the assessment" of gang members, and based on that testimony held that "the risk of error is considerable when such a determination is made without any participation by, or opportunity to provide evidence on behalf of, the individual…." *Vasquez*, 734 F.3d at 1046-47 (citation and internal quotation marks and brackets omitted).

The expert declarations submitted here and the findings of *Vasquez* prove why the Defendants' one-sided process is unreliable. "[C]lassifying young people as gang members… is an art, even an expert judgment, but is inherently subjective enough to be disputable." Declaration of Malcolm W. Klein ("Klein Decl.") ¶ 8.

1    This is true for several reasons. "Gangs lack formal, structural, institutional

2    arrangements that make clear divisions between members and nonmembers…

3    outsiders, such as police, prosecutors, … may have difficulty characterizing youth

4    as gang members." Declaration of James Diego Vigil ("Vigil Decl.") ¶ 19; *see id.*

5    ("Law enforcement is particularly limited in their ability to judge gang

6    membership…."); *Vasquez*, 734 F.3d at 1046 (noting gangs are often loose knit

7    and without structure). Gang members also "differ in the length and level of their

8    involvement." Vigil Decl. ¶ 15. "[T]he majority of people who have some

9    involvement in gangs voluntarily cease gang membership within a short time." *Id.*

10   ¶ 18; *see Vasquez*, 734 F.3d at 1046 (noting gang membership continually

11   changes).

12          Determining gang membership on the basis of association with others in the

13   community or presence in "gang hangouts" is also fraught with error. Because of

14   "the conflation of family, neighborhood, and gang, it becomes difficult to

15   determine who is or is not a gang member, or at what time membership may exist."

16   Klein Decl. ¶ 7. "[I]t is very common for non-gang members to maintain some

17   type of relationship with their friends-turned-gang-members… [or] for a family

18   unit to have both gang and non-gang members." Vigil Decl. ¶ 11. Even reliance on

19   "self-admissions" or joint criminal activity with gang members is not dispositive.

20   "[A] boastful statement that a person is from, for example, 'Echo Park,' [] might be

21   a claim that the person is part of… the gang" whereas for "another person… the

22   same statement might simply indicate that they are 'from the neighborhood,' that

23   is, a non-gang-member resident of the barrio." *Id.* ¶ 10. Individuals may also "self-

24   admit" because "the presence of gang members may cause people who are not

25   members to claim membership, because… they do not want to be seen denying

26   association with gang members, even if they do not consider themselves to be part

27   of the gang or engage in gang activity." Klein Decl. ¶ 16. Given strong

28   neighborhood ties, nonmembers may "even commit crimes with [gang members],

-14-

1   without being a gang member….” Vigil Decl. ¶ 13.

2          In finding a high risk of error, *Vasquez* relied on the fact that a "wide variety

3   of information… may be deemed relevant" to gang membership. *Vasquez*, 734

4   F.3d at 1047 (quotation marks omitted); *see also id.* (relying on gang officer's

5   testimony that there was "no 'equation' to determine gang membership; no 'bright

6   line rule'; and 'every situation can be different'"). Similarly here, Defendants'

7   express policy is that deputy city attorneys should determine gang membership by

8   "exercis[ing] independent and informed judgment based on all available evidence

9   and the totality of the circumstances." *See* 2009 Guidelines, App. A at 23.

10  Although the City provides criteria as guidance, Prof. Vigil opines that reliance on

11  factors such as association with other alleged gang members, gang signs, attire, or

12  tattoos, and presence in "gang hangouts" is "problematic" for the reasons discussed

13  above: the criteria are "so entangled with both neighborhood *and* gang identity that

14  it is likely to lead to erroneous identification of gang members." Vigil Decl. ¶¶ 20-

15  21. The same is true for "self-admissions" and reliance on joint criminal activity.

16  *Id.* ¶ 21. Prof. Vigil further notes that the determinations are problematic because

17  the information captured is not comprehensive and comprises only snapshots, and

18  because the fluidity of gang membership will likely lead to errors. *Id.* ¶¶ 22-23.

19  Finally, he notes that "the definition of 'active participant' [contained in the

20  guidelines] is nebulous and difficult to gauge." *Id.* ¶ 23; *see also* Muñiz Decl. ¶ 52

21  (the "vague and over-broad" criteria employed by the City lead to judgments about

22  gang membership that are "subjective, biased, and laden with assumptions drawn

23  from mundane behavior").

24          Moreover, post-deprivation procedures cannot remedy the initial erroneous

25  denial of process in this context. Due process requires "some kind of a hearing

26  *before* the State deprives a person of liberty…." *Zinermon v. Burch*, 494 U.S. 113,

27  127 (1990). If it is feasible for the government to provide pre-deprivation process,

28  it must do so, regardless of the adequacy of the post-deprivation remedies

-15-

available. *See Shinault v. Hawks*, 782 F.3d 1053, 1058 (9th Cir. 2015). In certain "limited cases" post-deprivation process can cure an unconstitutional deprivation of liberty, *id.*, but this is not one of those cases because serving and enforcing a gang injunction does not require "prompt action," and the government interest does not outweigh the need for pre-deprivation hearings. *Id.* The City remains able to enforce criminal laws, so there is no public safety or urgency rationale to justify not providing Mr. Arellano with pre-deprivation process.[5] Even if this *were* one of the "limited cases" in which a post-deprivation remedy could conceivably cure the unconstitutional deprivation of liberty, the post-deprivation remedies provided by the City are insufficient to do so for reasons stated in *Vasquez*. *First*, the administrative removal process established by the City in 2007 suffers from the same defects that the *Vasquez* court identified when it found purported post-deprivation process inadequate. As an initial matter, the individual making the determination of whether to grant or deny the petition works for the City Attorney, and although Mr. Arellano has some ability to submit evidence, he has no ability to examine or respond to the evidence considered by LAPD and the City Attorney. Further, the process lacks definitive criteria for determining gang membership and there is no requirement that the City explain its findings. This leaves "the burden… on the petitioning individual to demonstrate that he or she is *not* an active gang participant," trying to "prove a negative" in a "factual vacuum." *Vasquez*, 734 F.3d at 1050. Even applicants who meet all the stated criteria for removal typically wait over a year for a decision. *See* Green Decl.; Muñiz Decl. ¶ 35. Moreover, the opt-out provision in the Echo Park injunction suffers from the same basic defects in that Mr. Arellano bears the burden of demonstrating that he is *not* an active

---

[5] Notably, the *Vasquez* court only assumed — but did not decide — that imposition of a gang injunction was one of the "limited cases" where post-deprivation remedies could cure the unconstitutional deprivation of liberty. *See Vasquez*, 734 F.3d at 1048 & n.22.

1   participant in the gang, it lacks a definitive criterion for the court's determination,

2   and contains no provision for discovery of evidence.

3        *Second*, post-arrest criminal contempt proceedings are insufficient as a

4   matter of law. As the Ninth Circuit held in *Vasquez*, in light of the "pervasive

5   interference with Plaintiffs' liberty interests and the lack of adequate pre-

6   deprivation procedural safeguards, post-arrest contempt proceedings are

7   insufficient to cure the unconstitutional deprivation of liberty, including jail time,

8   that would occur before a criminal contempt trial would be held." *Vasquez*, 734

9   F.3d at 1052 (internal quotation marks, brackets and ellipsis omitted).

10       *Third*, as in *Vasquez*, intervention in the state case, or moving to modify the

11  injunction after it is issued, are inadequate remedies. Mr. Arellano attempted to

12  intervene in the state court action, but the City opposed, and the state court denied

13  his motion. And modifying the injunction would not provide Mr. Arellano the

14  relief he seeks of being freed of the injunction altogether. *See Vasquez*, 734 F.3d at

15  1050-55 (holding both inadequate to cure deprivation).

16       Thus, the risk of erroneous deprivation and the inadequacy of the post-

17  deprivation procedures weigh heavily in favor of Mr. Arellano.

18              3.     *Defendants Have No Interest in Failing to Provide Process*

19       Applying the last *Mathews* factor, the City cannot show a significant interest

20  "in failing to provide a pre-deprivation process through which an individual can

21  challenge [its] allegations of his active gang membership." *Vasquez*, 734 F.3d at

22  1052. Notably, the question is "*not* whether [the City] has a significant interest in

23  combating gang violence—no one doubts that they do—but rather whether they

24  have a significant interest in failing to provide a pre-deprivation process." *Id.*

25  (brackets in original omitted).

26       The City cannot establish that providing Mr. Arellano with *one* hearing or

27  other pre-deprivation process is too costly or burdensome. Such fiscal and

28

administrative burdens "are precisely the sort of administrative cost that we expect our government to shoulder," *Humphries*, 554 F.3d at 1194, particularly when such important liberty interests are at stake. Moreover, the fact that several other California jurisdictions, including San Francisco and, post-*Vasquez*, Orange County, provide pre-deprivation hearings demonstrates that such process is feasible. *See* RJN, Exs. 96-106. In fact, LAPD will soon provide notice and an opportunity to be heard by a neutral court to individuals they seek to place in the CalGang database. *See supra* n.6. The decision to subject a person to the greater, more immediate restrictions of an injunction should come with more process.

Nor can the City argue that providing Mr. Arellano pre-deprivation process will hinder LAPD in its ability to fight and abate gang crimes in Echo Park.[6] The supporting expert declarations demonstrate that there is little evidence that gang injunctions are effective tools to reduce gang crime, and that even for active gang members, research has found "no significant evidence that being enjoined deterred [them] from crime or violence." Muñiz Decl. ¶ 31; *see* Klein Decl. ¶ 22. In fact, the experts discuss evidence that gang injunctions could actually have a *negative* effect because they "increase gang cohesion" and "create greater community antagonism with police, less identification with law enforcement, and less police-civilian trust." Muñiz Decl. ¶ 32; *see also* Klein Decl. ¶ 25. The pre-deprivation process, moreover, would not prevent Defendants from enforcing criminal laws.

*          *          *

Under the Ninth Circuit's analysis in *Vasquez*, Mr. Arellano is likely to prevail on his claim that Defendants violated due process by enforcing the Echo Park injunction against him without providing any pre-deprivation process by which he could contest their allegations of gang membership.

---

[6] Indeed, the Echo Park injunction did not target a high-crime neighborhood, as the action was brought at a time when the crime rates in the area were at their *lowest* in thirty years. *See* Muñiz Decl. ¶ 48.

#### 4.     *The California Constitution*

The California Constitution provides greater procedural due process rights for private parties than the U.S. Constitution. *See Today's Fresh Start, Inc. v. L.A. Cnty. Office of Educ.*, 57 Cal. 4th 197 (2013). The due process analysis under the California Constitution looks at the *Mathews* factors plus a fourth factor: the "dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." *Id.* at 213 (internal quotation marks and citations omitted). As that factor weighs heavily in favor of Mr. Arellano, he is even more likely to prevail on his due process claim under California law.

### B.     Mr. Arellano Suffers Ongoing Irreparable Harm

Mr. Arellano has suffered, and (absent preliminary injunctive relief) will continue to suffer, immediate and irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Mr. Arellano is being deprived of basic and fundamental constitutional rights, and has been arrested and threatened with arrest and criminal prosecution for exercising these rights. As discussed *supra* in Sections II.D and III.A.i, he has been prohibited from being out in public with family and friends who the police assert are members of the Echo Park gang, he stays "under house arrest" instead of enjoying his neighborhood, and the times he has been outside in the Safety Zone with friends he has been stopped or arrested by LAPD for doing so. Mr. Arellano has therefore established irreparable harm.

### C.     The Equities Tip Sharply in Mr. Arellano's Favor

The balance of equities tip sharply in Mr. Arellano's favor. The requested

relief would allow Defendants to enforce the injunction against Mr. Arellano if they first provide him due process. The fiscal and administrative burdens in providing additional process are insignificant when compared to his weighty interests. *Cf. Golden Gate Rest. Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("Faced with… a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in favor of the latter.") (internal quotation marks omitted); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required."). And until Defendants provide additional process, they still can enforce criminal laws against Mr. Arellano, should he violate any. The hardship on the City is negligible.

### D.   A Preliminary Injunction is in the Public Interest

Finally, the relief requested by Mr. Arellano unquestionably is in the public interest. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). The requested relief would not categorically bar the City from enforcing the injunction against Mr. Arellano, but would prohibit it only unless and until they provide him with due process. Providing due process serves the public at large by "generating the feeling, so important to a popular government, that justice has been done." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 172 (1951).

## IV.   CONCLUSION

For the foregoing reasons, Mr. Arellano respectfully requests[7] that the Court enter an order barring the City from enforcing the Echo Park injunction against him, as set forth in the Proposed Order.

---

[7] Plaintiffs do not request that the Court specify the nature of any pre-deprivation process that may be provided to Plaintiffs to cure any constitutional deprivation.

1

2   Dated:  October 31, 2016          ACLU FOUNDATION OF SOUTHERN

3                                     CALIFORNIA
                                        PETER BIBRING
4                                       CARMEN IGUINA
                                        CATHERINE WAGNER
5                                       MELANIE P. OCHOA

6                                     By:   s/ *Carmen Iguina*
7                                             Carmen Iguina

8                                     *Counsel for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM ISO MOTION FOR PI FOR PETER ARELLANO